## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JEFFREY FITZGIBBON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FAIRMOUNT SANTROL HOLDINGS INC., JENNIFFER D. DECKARD, MATTHEW F. LEBARON, WILLIAM E. CONWAY, MICHAEL G. FISCH, CHARLES D. FOWLER, STEPHEN J. HADDEN, MICHAEL C. KEARNEY, WILLIAM P. KELLY, MICHAEL E. SAND, and LAWRENCE N. SCHULTZ, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT – CLASS ACTION – FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Jeffrey Fitzgibbon ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common shares of Fairmount Santrol Holdings Inc. ("Fairmount" or the "Company") against Fairmount and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Fairmount, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between Fairmount

and Unimin Corporation ("Unimin"), a subsidiary of SCR-Sibelco NV ("Sibelco").

2.      On December 11, 2017, the Board caused the Company to enter into an Agreement and Plan of Merger ("Merger Agreement"), pursuant to which each share of Fairmount's common stock will be converted into the right to receive: (i) the number of shares of Unimin common stock that will result in the holders of Fairmount Common Stock, together with the holders of certain Fairmount equity awards, owning 35% of the Unimin Common Stock (the "Exchange Ratio"); and (ii) an amount in cash equal to the result of (x) $170,000,000, divided by (y) the Fully Diluted Fairmount Share Number, without interest (together with the Exchange Ratio, the "Merger Consideration).

3.      On April 26, 2018, in order to convince Fairmount's shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading Definitive Proxy Statement on a Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) a comparable value of the Merger Consideration; (ii) financial projections for both companies; (iii) the valuation analyses performed by Fairmount's financial advisor, Wells Fargo Securities, LLC ("Wells Fargo"), in support of its fairness opinion; (iv) information relating to the Background of the Merger; and (v) potential conflicts of interest faced by the Wells Fargo.

5.      The Proxy also stated that the special meeting of Fairmount shareholders to vote on the Proposed Merger is scheduled for May 25, 2018 (the "Shareholder Vote").  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the Shareholder Vote so that they can properly exercise their corporate suffrage rights.

6.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Fairmount's shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

8.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Fairmount maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

10.     Plaintiffs is, and at all relevant times has been, a shareholder of Fairmount.

11.     Defendant Fairmount is a Delaware corporation and maintains its principal executive offices at 8834 Mayfield Road Chesterland, Ohio 44026.  The Company provides high-performance sand and sand-based product solutions used by oil and gas exploration and production companies to enhance the productivity of their wells.  Fairmount common shares are listed and traded on the NYSE under the ticker symbol "SXE".

12.     Individual Defendant Jenniffer D. Deckard is a director of Fairmount and is the President and Chief Executive Officer of the Company.

13.     Individual Defendant Matthew F. Lebaron is a director of Fairmount and is the Chairman of the Board.

14.     Individual Defendant William E. Conway is, and has been at all relevant times, a director of the Company.

15.     Individual Defendant Michael G. Fisch is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Charles D. Fowler is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Stephen J. Hadden is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Michael C. Kearney, and has been at all relevant times, a director of the Company.

19.     Individual Defendant William P. Kelly is, and has been at all relevant times, a director of the Company.

20.     Individual Defendant Michael E. Sand is, and has been at all relevant times, a director of the Company.

21.     Individual Defendant Lawrence N. Schultz is, and has been at all relevant times, a director of the Company.

22.     The parties identified in paragraphs 11-21 are collectively referred to as the "Defendants."

## <u>CLASS ACTION ALLEGATIONS</u>

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Fairmount (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of April 2, 2018, there were 224,954,671 shares of Fairmount common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Fairmount will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.   Background and the Deal Announcement

25.    Fairmount Santrol Holdings Inc., incorporated on January 25, 1996, is a provider of sand-based proppant solutions. The Company operates through two segments: Proppant Solutions, and Industrial & Recreational (I&R) Products. Its Proppant Solutions segment provides sand-based proppants for use in hydraulic fracturing operations throughout the United States and Canada, Argentina, Mexico, China, northern Europe and the United Arab Emirates. Its I&R segment provides raw, coated, and custom blended sands to the foundry, building products, glass, turf and landscape, and filtration industries in North America. Its asset base includes approximately 800 million tons of proven and probable mineral reserves. As of March 2017, the Company had 10 sand processing facilities with 16.8 million tons of annual sand processing capacity. Its coating facilities include operations in Mexico, Denmark and China, through which it serves international oil and gas markets.

26.    Unimin produces non-metallic industrial minerals for industrial, manufacturing, and commercial applications in North America. It offers industrial silica sand that is used in glass, ceramic, and silicate manufacturing, as well as in building products, filtration, and energy service applications; nepheline syenite that is used in various industrial processes; high purity quartz, which is used as an indispensable component of semiconductor chips, solar cell manufacturing, and quartz lighting applications; and feldspar alumino-silicates that is used in chemical corrosion in ceramic wares, electrical porcelain, and various types of glass and fiber insulation. The company also provides lime and limestone, which is used in metallurgy, pulp and paper manufacturing, water treatment, air quality management, and other industrial applications; microcrystalline silica for applications in paints, plastics, rubber, and composite materials; kaolin clays used in fiberglass,

ceramic, and functional filler applications; ball clays for use in rubberized products, membranes, and flexible coatings; and calcite and calcium carbonate feedstocks for use in PVC plastic, flexible film, and paint applications. Its products are used in glass, ceramics, oil and gas, metals and casting, electronics, plastic and rubber, paint and coatings, chemical and industrial, and construction and engineering applications. The company was founded in 1970 and is headquartered in New Canaan, Connecticut. It has processing plants and offices in North America. Unimin Corporation operates as a subsidiary of SCR-Sibelco N.V.

27.     Sibelco is a material solutions company, engages in the production and supply of industrial minerals internationally. The company offers aluminium trihydrate, natural and precipitated barite, bentonite, calcium carbonate, chromite, clay and kaolin, cristobalite, and dolomite materials. It also provides feldspar, glass cullet, iron oxide, quicklime and hydrated lime, limestone, magnesia, magnetite, manganese dioxide, nepheline syenite, olivine, proppant, quartz, resin coated sand, silica, talc, and wollastonite materials. In addition, the company offers mineral sands, such as ilmenite, rutile, and zircon; and a range of additional mineral products, including huntite/hydromagnesite, calcium silicate, iron carbonate, calcined bauxite, lithium mineral, colemanite, lime fertilizer, fused silica, and ulexite products. It serves agriculture, ceramics, coatings and polymers, construction and engineering, energy, electronic, glass, mining and metallurgy, and sports and leisure industries. The company was founded in 1872 and is headquartered in Antwerp, Belgium.

28.     On December 12, 2017, Fairmount and Unimin issued a joint press release announcing the Proposed Merger.  The press release stated, in relevant part:

**Fairmount Santrol and Unimin to Merge, Creating a Leader in Proppant and Industrial Materials Solutions**

•       Combination launches a leader in serving the industrial and energy industries with an estimated 45 million tons of annual processing capacity

•       A uniquely diversified business across end-markets and geographies, supported by high-quality assets, complementary products and industry-leading distribution networks

•       Significant value creation supported by a large, resilient industrial business and leading proppant business

•       Substantial earnings accretion from $150 million in targeted annual synergies, with 50% achievable in the first year after close

•       Current Fairmount shareholders to receive $170 million in cash and 35% ownership in the combined company

Fairmount and Unimin to Host Conference Call at 8:30 AM ET Today

CHESTERLAND, Ohio and NEW CANAAN, Connecticut, December 12, 2017 — Fairmount Santrol (NYSE:FMSA) ("Fairmount") and Unimin Corporation ("Unimin"), a wholly owned subsidiary of SCR-Sibelco NV ("Sibelco"), today announced that the Boards of Directors of both companies have approved a definitive agreement under which Fairmount and Unimin will combine in a tax-free, cash and stock transaction.

The new company, which will list on the New York Stock Exchange, will combine the two organizations' strong product portfolios and asset footprints to create an industry-leading proppant and industrial materials solutions provider, serving both energy and industrial customers. The combined company is expected to have 45 million tons of annual sand and mineral processing capacity and 3.0 million tons of annual coating capacity. In addition, the combined company will operate a comprehensive logistics platform with a large-scale terminal network across North America, comprising 96 distribution terminals with 18 unit-train capable terminals, and access to all major railways serving major oil and gas basins.

On a pro forma basis, the new company would have had revenue of approximately $2.0 billion and Adjusted EBITDA of approximately $400 million, excluding expected synergies, for the 12 month period

ended September 30, 2017. The industrial segment represents 45% of gross profit and the proppants segment represents 55%.

The transaction is expected to generate significant shareholder value, including a $170 million cash payment to Fairmount shareholders. In addition, it is expected to strengthen the companies' leadership positions in serving both the industrial and energy markets through a broader, more diverse product offering and logistics footprint. The combined company is targeting $150 million of identified annual operational synergies, resulting in over $1 billion in value creation.

"This is a compelling transaction for our shareholders and for our many other stakeholders, including our customers, employees and communities," said Jenniffer Deckard, President and Chief Executive Officer of Fairmount Santrol. "By combining the complementary strengths of both Unimin and Fairmount Santrol, we will create a premier provider of industrial materials and proppant solutions with benefits and growth opportunities that far surpass what either company could achieve alone. Together we will serve our customers more efficiently and effectively with a broader and more diverse product offering, greater technical expertise, improved scale and geographic diversity and an expanded logistics platform. We have long respected the Unimin organization and believe our shared cultures of sustainability and long-term value creation will enable us to realize the benefits of this merger."

Campbell Jones, President and Chief Executive Officer of Unimin, said, "We are excited to join forces with Fairmount as we believe this combination is an ideal fit for our value-driven orientation and long-term vision of strength through diversity of products and end markets. Fairmount is an excellent partner for Unimin and shares our strategy of providing superior and innovative product solutions for the growing energy and industrial segments. Together, our combined network of flagship plants, terminals and rail access will deliver greater capacity and more cost-competitive supply to meet our customers' needs."

Matthew LeBaron, Chairman of the Fairmount Santrol Board of Directors, said, "We are pleased with this combination, which brings together two industry leaders at an opportune time in the industry. This transaction will deliver significant value for Fairmount shareholders through immediate cash consideration and the opportunity to participate in the upside of the combined company. The combined company will have a strong capital structure, backed by diverse cash flow streams, which will position it to make strategic

growth investments and further enhance returns for shareholders. On behalf of my fellow directors, we look forward to what Fairmount and Unimin will accomplish together."

"This combination is a unique opportunity to create an industry-leading company with the ability to generate significant long-term value for shareholders," said Jean-Luc Deleersnyder, Chief Executive Officer of Sibelco. Mr. Deleersnyder continued, "We are confident that the combined company will be in a strong position to leverage its strengths to generate significant cash flow that can be used to capture targeted growth opportunities and to reduce debt. Our position as a long-term investor reflects our belief in the value that will be created by the merger and enables the consolidated entity to leverage our global capabilities."

**Strategic and Financial Position of the Combined Company**

•    Leading materials solutions provider to both the energy and industrial segments: The combined company will be a leading industrial materials and proppant solutions provider with improved scale, approximately 45 million tons of annual sand and mineral production capacity, and more than 1.3 billion tons of combined reserves. The combined entity will be the largest provider of proppant solutions to the energy industry and of industrial materials solutions, will possess the most extensive technical and applications expertise, and will have the largest portfolio of high-purity sands and nepheline syenite production in North America.

•    Diversification across assets, geographies and end markets: The combined company's complementary asset footprint is well positioned to serve resilient and attractive markets including oil & gas, glass, construction, ceramics, coatings, polymers and foundry markets. Through both strategically located plants and an enhanced distribution network with access to all major rail lines, the combined company will have an exceptional position to deliver products and services to a broad customer base across energy and industrial markets.

•    Significant value creation through operational synergies and greater access to diverse and growing industrial business: The combined company expects to further enhance earnings and value through substantial operational synergies, targeting $150 million in annual synergies, and capturing 50% of the synergies in the first year following close. The new company's significant and more predictable cash flow generation is a benefit of more diverse revenue streams from the industrial segment strengthened by combinational

- 11 -

synergies, increased scale and complementarity of assets. These synergies and improved cash flows will provide the combined company with increased financial flexibility, including the ability to reduce leverage and make strategic investments.

**Key Transaction Terms and Details**

Under the terms of the merger agreement, at the closing of the transaction, Fairmount shareholders, including equity award holders, will receive $170 million in cash, or approximately $0.74 per share based on Fairmount's current diluted share count, and will own 35% of the combined company, with Sibelco owning the remaining 65%. The transaction is structured to be tax-free to Fairmount shareholders. Sibelco will maintain ownership of Unimin's high-purity quartz business, which mainly serves electronics manufacturers in Asia.

In connection with the transaction, Unimin has secured fully committed financing from Barclays Bank PLC and BNP Paribas to refinance both companies' outstanding debt obligations and certain transaction expenses. The companies believe that the strong and diversified cash flow resulting from the combination will allow the combined company to pay down debt expeditiously.

Concurrent with closing, the combined company intends to list its shares on the New York Stock Exchange, while Fairmount will be delisted from the New York Stock Exchange.

Governance, Leadership and Headquarters

Upon closing, the combined company's Board of Directors is expected to comprise 11 members, six of whom will be recommended by Sibelco, including Jean Luc Deleersnyder, Sibelco's Chief Executive Officer, and four of whom will be recommended by Fairmount. Jenniffer Deckard, current Chief Executive Officer of Fairmount Santrol, is expected to serve as CEO and as a director of the combined company. Sibelco has the right to nominate the independent Chairman of the combined company.

The executive leadership team will include a combination of existing leaders from both Unimin and Fairmount, with the combined company leaning on the significant strengths of the quality workforce across both companies.

The location of the combined entity's headquarters will be determined prior to closing, and the combined company will

maintain regional offices in order to leverage both companies' significant operating presence, strong partnerships and talented employee bases. Unimin and Fairmount have highly recognizable and well respected names, and the name of the combined company will be determined before the closing of the transaction.

**Approvals**

The transaction is expected to close in mid-2018, subject to the approval of Fairmount shareholders, the receipt of regulatory approvals and the satisfaction of other customary closing conditions.

Fairmount Santrol has entered into a voting agreement with certain holders of 26 percent of Fairmount's outstanding common stock, pursuant to which they will vote their shares in favor of the transaction.

**Advisors**

Wells Fargo Securities, LLC is serving as Fairmount's financial advisor and Jones Day is serving as its legal advisor. Morgan Stanley is serving as Sibelco's financial advisor, and Freshfields Bruckhaus Deringer and Hughes Hubbard are serving as its legal advisors. Barclays Bank PLC and BNP Paribas also provided additional advice to Sibelco on certain aspects of the transaction.

**About Fairmount Santrol**

Fairmount Santrol is a leading provider of high-performance sand and sand-based product solutions used by oil and gas exploration and production companies to enhance the productivity of their wells. The Company also provides high-quality products, strong technical leadership and applications knowledge to end users in the foundry, building products, water filtration, glass, and sports and recreation markets. Its expansive logistics capabilities include a wide-ranging network of distribution terminals and railcars that allow the Company to effectively serve customers wherever they operate. As one of the nation's longest continuously operating mining organizations, Fairmount has developed a strong commitment to all three pillars of sustainable development, People, Planet and Prosperity. Correspondingly, the Company's motto and action orientation is: "Do Good. Do Well." For more information, visit FairmountSantrol.com.

## About Unimin

Unimin is an application-focused minerals company providing materials solutions to its customers drawing from a diversified product portfolio and the worldwide production capabilities of Sibelco, our privately held parent organization. Unimin is one the largest producers of quartz proppants for oil and natural gas stimulation and recovery and is a leading supplier of multi-mineral product offerings to industrial customers in glass, construction, ceramics, coatings, polymers and foundry markets.

Unimin operates a portfolio of strategically located and long life assets with 38 sand, mineral and coating processing facilities in the United States, Canada and Mexico that serve a variety of energy and industrial customers. Our company a broad portfolio of minerals including silica sand, with feldspar, nepheline syenite, lime, clays (incl. kaolin), calcium carbonate and olivine allowing the company to offer a multi-mineral product mix to its industrial customers. We have built long-standing relationships with our key customers and have a broad customer base comprised of S&P 500 and blue chip customers. We operate an extensive logistics and distribution network with access to five Class 1 railroads, a large number of in-basin oil and gas operating terminals and strong unit-train capabilities.

## About Sibelco

Sibelco is a Belgian private-owned business which manufactures and distributes an extensive multi-mineral portfolio consisting of silica, clay, lime and other industrial, non-metallic (specialty) minerals. We are a global leader in material solutions, transforming raw materials with technology and know-how to offer solutions with and beyond minerals. We support the progress of modern life and our industrial minerals are supplied to a diverse range of applications including glass, ceramics, construction & engineering, paint, coatings, polymers, metals and casting, oil & gas and agriculture. Our company has a strong presence around the world, operating in over 200 production sites in more than 40 countries with a team of over 10,000 people. Sibelco's commitment to sustainable development and operational excellence is entrenched in our culture. For more information, visit www.Sibelco.com.

## II.     The Proxy Is Materially Incomplete and Misleading

29.     On April 26, 2018, Fairmount filed the Proxy with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

30.     First, the Proxy fails to provide a tangible value for the Merger Consideration that Fairmount shareholders could use to serve as a cognizable comparison. The Merger Consideration is presented in terms of the Exchange Ratio, plus cash. This does not adequately quantify to shareholders what they will be receiving in exchange for their shares of stock—which was trading around $5 per share prior the deal announcement. Furthermore, it prevents shareholders from comparing the value of Party B's last offer, $6.80, to the value of the Merger Consideration, unquantified. Therefore, it prevents shareholders from determining whether the Proposed Merger is in the Company's best interest, or if there could be a more valuable transaction available.

31.     Second, the Proxy fails to provide Total Enterprise Value (TEV) projections for both Fairmount and Unimin. TEV is an important financial metric that was specifically review and utilized by Wells Fargo in their valuation calculations, including the discounted cash flow analyses performed for Fairmount, and are material to the Company's shareholders. The omission of TEV projections renders the financial projections included in the Proxy materially incomplete and misleading

32.     Third, while the Proxy discloses projections for Adjusted EBITDA and Unlevered Free Cash Flows for the years 2017 through 2022, it fails to provide the line items that compose either of these financial metrics.  This is particularly troublesome in light of the fact that both Adjusted EBITDA and Unlevered Free Cash Flows are non-GAAP (generally accepted accounting principles) metrics that are standardized and, consequently, can be manipulated and easily taken out of context.  Because non-GAAP measures, such as Adjusted EBITDA and Unlevered Free Cash Flows, can be measured in different ways, it is inherently misleading when they are not taken in context with GAAP figures, such as Net Income or Operating Income.

33.     If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

34.     Accordingly, the failure to disclose the line-item projections for the specific metrics, adjustments, and/or inputs that are used to calculate these Non-GAAP financial measures or provide a reconciliation of the Non-GAAP measures to their most directly comparable GAAP financial measure renders the Proxy materially incomplete and misleading.

35.     With respect to Wells Fargo' *Discounted Cash Flow* Analyses, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 12.1% to 13.1% used for Unimin; (ii) the inputs and assumptions underlying the calculation of the discount rate range of 13.3% to 14.2% used for Fairmount; (iii)  the inputs and assumptions underlying the selection of the perpetuity growth rate range of 2.5% to 3.5%  used to calculate Unimin's terminal value; (iv) the inputs and

assumptions underlying the selection of the perpetuity growth rate range of 2.5% to 3.5% used to calculate Fairmount's terminal value; and (v) the actual terminal values calculated.

36.     These key inputs are material to Fairmount shareholders, and their omission renders the summary of Wells Fargo's *Discounted Cash Flow* Analyses incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

37.     With respect to Wells Fargo's *Selected Companies Analysis*, the Proxy fails to disclose the individual multiples Wells Fargo calculated for each company utilized. The omission of these multiples renders the summary of this analysis and the implied equity value reference ranges materially misleading.  A fair summary of the *Selected Companies Analysis* requires the

disclosure of the individual multiples for each company; merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

38.     With respect to the *Background of the Merger*, the Proxy indicates that Fairmount entered into confidentiality agreements with both Party A and Party B, but failed to disclose whether such agreements contained standstill and "don't ask don't waive" ("DADW") provisions, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect. Such information is material to Fairmount shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal.  The failure to disclose the existence of DADW provisions creates the false impression that any of the parties who signed confidentiality agreements could have made a superior proposal. That's not true. If those confidentiality agreements contained DADW provisions, they could only make a superior proposal by breaching the agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this information renders the descriptions of the confidentiality agreements the Company entered into materially incomplete and misleading.  Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

39.     Finally, the Proxy states that in the past, Wells Fargo has provided financial advisory services to Unimin and may continue to do so and has received, and may receive, fees for the rendering of such services. However, the Proxy fails to state the timing, nature, or amount of compensation received for such services. The failure to disclose this information is a material

omission and renders the Proxy misleading to Fairmount shareholders. Moreover, these types of dealings place Wells Fargo' interests on both sides of the Proposed Merger. The failure to specify the exact timing and nature of their services rendered, or quantify the compensation Wells Fargo received and may continue to receive from Unimin while acting as Fairmount's financial advisor is a serious area of concern for Fairmount shareholders.

40.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 240.14a-9 Promulgated Thereunder)**

41.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

42.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

43.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

44.     The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

45.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information concerning: (i) financial projections for both companies; (ii) the valuation analyses performed by Fairmount's financial advisor, Wells Fargo, in support of its fairness opinion; (iii) information relating to the *Background of the Merger*; and (iv) potential conflicts of interest faced by the Wells Fargo.

46.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

47.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the

Proposed Merger; indeed, the Proxy states that the Wells Fargo reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Wells Fargo as well as their fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review the Wells Fargo's analyses in connection with their receipt of the fairness opinion, question Wells Fargo as to the derivation of its fairness opinion, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

48.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a Proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

49.     Fairmount is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

50.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

51.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52.     The Individual Defendants acted as controlling persons of Fairmount within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Fairmount, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

53.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54.     In particular, each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

55.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

56.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

58.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying

Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

<u>**JURY DEMAND**</u>

Plaintiff demands a trial by jury on all issues so triable.

DATED: May 11, 2018                    Respectfully submitted,

**OF COUNSEL**                         **KARON LLC**
                                       *s/Daniel R. Karon*
**MONTEVERDE & ASSOCIATES PC**         Daniel R. Karon (#0069394)
                                       Beau D. Hollowell (#0080704)
Juan E. Monteverde                     The Hoyt Block Building, Ste. 200
The Empire State Building              700 West St. Clair Avenue
350 Fifth Avenue, Suite 4405           Cleveland, Ohio 44113
New York, NY 10118                     Phone: 216.622.1851
Tel.: (212) 971-1341                   Fax: 216.241.8175
Fax: (212) 202-7880                    Email: dkaron@karonllc.com
Email: jmonteverde@monteverdelaw.com   Email: bhollowell@karonllc.com

*Attorneys for Plaintiff*               *Attorneys for Plaintiff*